**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>CARMEN MARIA MERCADO FRATICELLI.<br><br>　　　Debtor. | CASE NO. 24-02341 MAG11<br><br>Chapter 11<br><br>FILED & ENTERED ON 4/14/2025 |

**<u>OPINION AND ORDER</u>**

On May 31, 2024 Carmen Maria Mercado Fraticelli ("Debtor") filed the instant petition for relief under Chapter 11, SubChapter V of the Bankruptcy Code.  Pending before the court is a motion filed by Debtor on October 22, 2024 requesting the valuation of her residential property, a two-story structure located in San Gerardo Street in the Santa Teresita Development in Ponce, Puerto Rico (the "Property") for purposes of 11 U.S.C. § 1129(b)(2)(A)(i), 11 U.S.C. § 506(a) and Fed. R. Bankr. P. 3012. Dkt. # 65. Such request was made after Blue View Capital LLC ("Blue View") filed an objection to the confirmation of the plan alleging, in part, that the value of their collateral was higher than the one provided in the plan and that "Debtor ha[d] not set forth admissible evidence regarding the value of the collateral." Dkt. # 47, p. 9. Debtor submitted an appraisal report prepared by Real Estate Appraiser Milton Flores, dated October 12, 2024, which valued the Property at $125,000. Dkt. # 70-1. Conversely, Blue View submitted an appraisal report from Real Estate Appraiser Carlos Xavier Velez, dated November 25, 2024, showing that the Property is valued at $178,500. Dkt. # 110-1. Confirmation of Debtor's amended plan dated October 22, 2024 hinges on the valuation of the Property. Dkt. # 68.

A valuation hearing was held on December 5, 2024, during which the court heard expert testimony from both appraisers. Dkt. ## 122, 127. Following the hearing, the court ordered the parties to submit simultaneous post-evidentiary hearing briefs. Id. On December 19, 2024, Debtor filed her post-evidentiary brief. Dkt. # 130. Subsequently, on January 15, 2025, Blue View submitted its post-evidentiary hearing brief after receiving an extension to do so. Dkt. # 139. After careful consideration of the testimony of both appraisers and the appraisal reports, for the reasons stated below, the court concludes that the value of the Property is $135,000.

## I.      JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), L. Civ. R. 83K(a), and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.      PROCEDURAL BACKGROUND

On May 31, 2024, Debtor filed a voluntary chapter 11 petition as a SubChapter V case and listed the Property as her only real estate property in schedule A/B with a value of $125,000. Dkt. # 1, p. 13; Dkt. # 21, p.2. Debtor listed Blue View in schedule D as having a claim in the amount of $123,154.15, secured with a lien over the Property. Dkt. # 1, p. 20, Dkt. 5-2, p.1.

On August 5, 2024, Blue View filed proof of claim number 1 in the amount of $283,593.07 for a loan secured by the Property. Claims Register # 1-1. At this time the claim has not been objected to thus it is allowed as filed.

On August 30, 2024, Debtor filed her plan or reorganization. Dkt. # 29. This plan proposed payment to Blue View's secured portion of the claim in the amount of $125,000 in 120 installments of $1,515.63 with 8% interest. Id. at p. 2. The plan also proposed payment to Blue

View for the unsecured portion of its claim in the amount of $220.27 for 36 months. Id. The court set the hearing on confirmation for October 17, 2024. Dkt. # 38. On October 3, 2024, Blue View filed an objection to the confirmation of Debtor's plan. Dkt. # 47.

On September 17, 2024, Blue View filed a motion to dismiss the case with a four-year bar to re-file. Dkt. # 37. On September 26, 2024, Debtor opposed Blue View's dismissal request. Dkt. # 42. The court scheduled the hearing on the motion to dismiss also for October 17, 2024 along with the hearing on confirmation. Dkt. # 38. Upon Debtor's request and Blue View's consent such hearing was rescheduled for October 15, 2024, at which time the court denied confirmation of Debtor's plan and took Blue View's motion to dismiss under advisement. Dkt. ## 57, 62, 74.

On October 22, 2024, Debtor filed an amended SubChapter V plan, a memorandum of law against dismissal, and a motion requesting a valuation hearing under Fed R. Bankr. P. 3012 to establish the value of the Property. Dkt. ## 68, 70, 71. On the same date, Blue View moved the court to strike all three documents. Dkt. # 75.

Debtor's amended plan proposes payment of Blue View's secured portion of the claim in the amount of $125,000 in 180 installments of $1,194.57 with 8% interest for a total payout of $215,055.66. Dkt. # 68, p. 5. The amended plan also proposes payment of Blue View's unsecured portion of the claim in the amount of $482.50 for 60 months. Id.

On October 28, 2024, Debtor opposed Blue View's motion to strike and on October 30, 2024 the court granted Blue View's motion to strike as to Debtor's memorandum of law against dismissal because the motion to dismiss had already been submitted and taken under advisement. Dkt. ## 81, 85. The court denied the motion to strike as to the amended plan and the request for

valuation hearing. Id. Also on October 30, 2024, the court entered an opinion and order denying Blue View's motion to dismiss with a four-year bar to refile. Dkt. # 86.

On October 31,2024, the court set the hearing on confirmation and valuation for December 5, 2024. Dkt. # 87.

On November 13, 2024, Blue View filed two motions for reconsideration: the first as to the denial of its motion to dismiss with a four-year bar to refile, and the second as to the court's order setting a hearing on valuation. Dkt. ## 99, 100. On November 18, 2024, Debtor opposed both motions for reconsideration. Dkt. # 101. Also on November 18, 2024, Blue View opposed Debtor's motion requesting valuation of the Property. Dkt. # 102. On November 22, 2024, Debtor replied to the opposition for valuation of the Property. Dkt. # 104.

On November 25, 2024, Debtor filed an application to employ Mr. Flores as the appraiser for the Property. Dkt. # 107.

On November 26, 2024, Debtor submitted Blue View's ballot rejecting Debtor's amended plan. Dkt. # 109.

On November 27, 2024, Blue View filed an objection to the confirmation of Debtor's amended plan. Dkt. # 110.

On December 2, 2024, Blue View supplemented its objection at Dkt. # 102 to the valuation hearing requested by Debtor and replied to Debtor's oppositions at Dkt. # 101 regarding Blue View's motions for reconsideration regarding the denial of its dismissal request and the valuation hearing. Dkt. ## 114, 116. Blue View also moved to strike Debtor's reply at Dkt. # 104 as to the valuation issue. Dkt. # 117. On December 3, 2024, the court denied Blue View's opposition to Debtor's request for a valuation hearing under Fed R. Bankr. P. 3012. Dkt. # 118.

4

On December 5, 2024, the court held the hearing on the valuation of the Property. Dkt. ## 122, 127. The court denied as moot the motion for reconsideration filed by Blue View as to the valuation hearing at Dkt. #100 and took under advisement the motion for reconsideration filed by Blue View as to the denial of its motion to dismiss with a four-year bar to refile at Dkt. # 99. Id.

On December 19, 2024, Debtor filed its post evidentiary brief. Dkt. # 130. On January 15, 2025, after having been granted an extension to do so, Blue View filed its post evidentiary brief. Dkt. # 139.

### III.    VALUATION HEARING

During the December 5, 2024 valuation hearing the court heard testimony from two witnesses: (i) Milton Flores, a real estate appraiser and expert witness for Debtor and (ii) Carlos Xavier Velez, a real estate appraiser and expert witness for Blue View. Debtor and Blue View agreed that both appraisers were qualified to provide expert opinions regarding their respective valuation reports, therefore both appraisers were allowed to testify as expert witnesses, and their valuation reports were admitted into evidence at the hearing. Debtor's valuation report dated October 12, 2024, prepared by Mr. Flores, was admitted into evidence as Debtor's Exhibit 1, and Blue View's valuation report dated November 25, 2024 prepared by Mr. Velez was admitted into evidence as Blue View's Exhibit 1. Dkt. ## 70-1, 110-1.

As described in both appraisals, the Property is in 5001 San Gerardo Street in the Santa Teresita Development in Ponce, Puerto Rico and is a two-story, multi-family residence with a living space of 2,426 square feet, including seven bedrooms and three bathrooms. Both appraisers included photographs of the interior and exterior of the Property in their respective reports. Dkt. ## 70-1, 110-1.

**(i)     Debtor's expert witness**

Debtor's expert, Mr. Flores, testified as to his appraisal report valuing the Property "as is" at $125,000 as of October 12, 2024. Dkt. # 70-1. He provided his testimony and was subject to cross-examination by Blue View. Mr. Flores, a real estate appraiser for twenty-eight years, was engaged by Debtor's husband, Mr. Miguel Rivera Cosme, to provide a market value opinion of the Property.

Mr. Flores explained that to prepare Debtor's valuation report, he inspected both the exterior and interior of the Property, took measurements and photographs, and utilized comparable sales data.  He elaborated on his methodology, indicating that he based his analysis on three comparable sales: two within the same development as the Property and a third located in a nearby neighborhood. He adjusted the sales prices of the three properties to reflect differences in quality of construction materials, square footage, and other characteristics. He testified that the Property is a two-story residence with its first level made of reinforced concrete and its upper level made of wood that is over 25 years old.

Mr. Flores further explained that the Property is currently utilized as a residence for two separate families, with each story occupied by different households. The second-floor unit has a separate entrance, making it a fully independent living space.

When questioned about the inclusion of comparable sale properties that are fully concrete properties, Mr. Flores explained that there was no available data located in Ponce for identical properties to the Property, with a reinforced concrete first floor and a wooden second story. Consequently, he had to adjust his search to include properties that have two independent units while accounting for differences in the quality of construction. He noted that properties constructed primarily of wood tend to be approximately 10% less attractive in the market

because they are usually older, and due to potential termite issues, have higher insurance costs and consequently overall higher mortgage payments.

Further elaborating on his decision to focus solely on the Ponce area for his comparable sales, Mr. Flores invoked the principle of substitution in appraisals. He emphasized that Ponce is a large city with unique market characteristics and that properties located outside of Ponce do not share the same neighborhood attributes or market dynamics and that including properties from other municipalities would lead to discrepancies in value.

When discussing the methodology for his valuation report, Mr. Flores explained that he used the sales comparison and cost approaches and did not consider the income approach because in residential properties of this type, especially those with wooden second level constructions, such additional living space is usually occupied by family members and do not produce income. Specifically, as to the Property's income potential, Mr. Flores explained that he did not consider the income approach because at this time it is Debtor's daughter who occupies the second floor living space and she does not pay rent. Mr. Flores testified that the wooden structure in the Property has little to no value.

Mr. Flores highlighted that people generally prefer not to live in wooden houses due to their associated risks: potential termite issues given that the wooden structure in the Property is over 25 years old, higher insurance costs that can make mortgage payments challenging, and financial institutions typically hesitate to finance wooden houses. Additionally, he mentioned the red firemen houses in Ponce, highlighting that these properties have municipal insurance due to their status as tourist attractions. Mr. Flores admitted that he did not include evidence in his report as to the purported refusal of financial institutions to finance wood houses.

7

Mr. Flores clarified that the appraisal report was specifically prepared to be submitted within a bankruptcy court proceeding and not as part of an application for a mortgage. He emphasized that this appraisal was not conducted for the secondary market, which typically requires compliance with regulations by the Financial Industry Regulatory Authority (FINRA) for properties that will be sold to third parties, who may not even inspect the property. He explained that when an appraisal is prepared for a legal purpose, compliance with FINRA requirements, such as termite inspections, is not necessary. When asked whether the value of the Property would differ if the report had been prepared for the secondary market, he responded that properties with older wooden structures often do not sell in the secondary market.

In defining an appraisal, Mr. Flores emphasized that it is an opinion of value provided by a licensed professional with the relevant education and experience. He stated that the appraisal of a residential property is primarily based on comparable sales data, asserting that the best valuation method for the Property was indeed through comparable sales in the market. However, Mr. Flores admitted that had a bank commissioned the report, it would have likely requested consideration of the income approach.

When discussing the adjustments for quality of construction made to the comparable sales in his report, Mr. Flores included a "Q-4" adjustment because all three comparable sales used in his analysis were fully concrete as opposed to the Property which has a wooden structure on its second floor. He explained that the Property, which features a combination of concrete and wood, warranted a lower quality designation especially given that the wooden elements are now over 25 years old. Mr. Flores noted however that wooden houses in Jajome, Cayey, for example, he considered Q-1 in terms of superior construction quality.

8

Mr. Flores explained how he arrived at the 10% adjustment for the three comparable properties used in his valuation. He indicated that he could not find properties that matched the exact combination of concrete and wooden materials on the second floor, which led to a downward adjustment of 10% due to differences in construction materials. Although he acknowledged that he had no concrete evidence demonstrating that buyers would pay 10% less for such properties, he observed that wooden homes tended to lease for lower amounts compared to concrete houses, which supported his decision not to include an income approach in his report. Instead, he focused on comparable sales and cost approaches. To calculate the 10% adjustment, Mr. Flores utilized information he gathered and performed a linear regression analysis; however, he did not include in his report the specific data he used. He stated that the 10% adjustment he applied was not meant to be a blanket adjustment, but rather specific to properties with similar characteristics, including the number of bathrooms, bedrooms, and square footage.

Mr. Flores asserted that he also considered supply and demand factors in the market for his valuation report. When asked if he considered the high demand and low supply of residences in the area, he confirmed that he had.

In the sales comparison approach section of his report, Mr. Flores evaluated the first comparable sale, which received a $45,000 concession by the Puerto Rico government of funds available for homebuyers after Hurricane Maria. Although the property was sold at $140,000, he admitted that he did not factor in this government grant. Regarding the second comparable sale included in his report, Mr. Flores noted that it was a Real Estate Owned (REO) property. He made no adjustments based on its REO status, stating that it was publicly listed, acquired for $90,000, and subsequently sold at market value for $125,000. He emphasized that this property

was sold after an open negotiation and the bank profited from the transaction instead of selling it at a discount.

Mr. Flores defined the term "highest and best use" as the development of a property in a way that maximizes its income potential. He outlined the three methods for conducting an appraisal: the market value approach based on comparable sales, the cost approach, and the income approach grounded in rental potential. He opted for the market value approach, stating that if he had employed the income approach, he would have adjusted the value according to the anticipated rent. While he indicated that the Property could theoretically generate rental income, his assignment focused on delivering market value and cost approach assessments.

When asked about the potential rental income of the Property, he estimated that the Property could yield around $500 to $600 per month in rental income, compared to $800 to $900 for concrete units. He noted that this type of property is generally not purchased by investors seeking income-generating assets. He further clarified that had the Property been rented at the time of the report, he would have considered the income approach but emphasized that it is not typically viewed as an income-producing property.

**(ii)    Blue View's expert witness**

Blue View's expert, Mr. Velez, testified as to his appraisal report valuing the Property "as is" at $178,500 as of November 15, 2024. (Dkt. # 110-1). He was subject to cross-examination by Debtor. Mr. Velez, a real estate appraiser with thirty-two years of experience, explained that he was engaged by Blue View to provide a market value opinion of the Property.

Mr. Velez explained that his appraisal process included an interior inspection conducted by an employee from his office, who took measurements and photographs and interviewed the

owner, noting that an interior inspection is not required for an opinion of value. Mr. Velez also performed an exterior inspection of the Property.

Mr. Velez also explained that to prepare his reports, he gathered data through property inspections, owner interviews, and relevant market comparisons. He noted a lack of comparable sales in Ponce due to limited availability of multi-family properties. In his report, he identified five comparable sales, mostly consisting of concrete buildings, and accounted for various adjustments based on market trends, conditions, and location. Moreover, he did not restrict his search to Ponce and included comparable sales in the municipalities of San German and Guanica involving mixed construction properties. He indicated that the adjustments made in his report reflect the motivation of a typical buyer, which for multi-family properties is to generate income.

Mr. Velez discussed the comparable sale properties included in his report to establish the value of the Property. For the first comparable sale, he made an upward adjustment of $45,000 for the government concession that was implemented in Puerto Rico in 2006 for first-time homebuyers, as well as a $12,500 upward adjustment due to the condition of the comparable property, which was inferior to that of the Property. For the second comparable sale, identified as an REO property, Mr. Velez noted that it was sold at approximately 30% below market value, requiring a $37,500 upward adjustment due to the property's condition. Additionally, an upward adjustment of $12,500 was made to account for current market conditions, as overall market values have been increasing.

Mr. Velez explained that he considered the sales comparison, cost, and income approaches to arrive at a final value, ultimately relying mostly on the income approach. He defined the "highest and best use" of the Property as its potential to generate income as a multi-family property, emphasizing marketability rather than current occupancy. He noted that a typical

11

buyer for this type of property would focus on the potential rental income from one or two of its units. Furthermore, he mentioned that having a family member or tenant occupying the second-floor unit results in a negative rent situation, as the owner still incurs in costs such as taxes and insurance.

Mr. Velez also explained the concept of "highest and best use" in property appraisals, which considers factors like legal permissibility, physical possibility, financial feasibility, and maximum productivity. This analysis considers scenarios assuming the property is vacant and evaluates legally permissible permits and zoning pertinent to the property in question. For the Property, the "highest and best use" is identified as multi-family use, enabling income generation through renting the second floor or the entire property.

Additionally, Mr. Velez noted that he made no adjustments for the Property's wood structure due to the high demand in the Ponce market for properties. He indicated that there was no evidence suggesting that the market would currently offer reduced rental rates for the second floor of the Property. He attributed this demand to the significant impact of recent events such as Hurricane Irma, Hurricane Maria, and the earthquakes in the south region of the Island, which have resulted in a shortage of properties available for sale or rent in the Ponce area. He emphasized that the high demand and low supply in the area are further evidenced by the decreased number of granted loans compared to previous years. Although the low supply in real estate properties is an island-wide issue, it has intensified in Ponce following the earthquakes. Mr. Velez indicated that his observations were based on internet searches and the overall decline in property sales due to a lack of availability, causing potential buyers to seek properties in nearby municipalities.

Mr. Velez noted that determining the "highest and best use" is essential before searching for comparable sales, emphasizing that one cannot effectively identify comparable properties without this determination. He identified the income approach as the primary methodology for valuing multi-family properties. Mr. Velez stated that he used the sales comparison approach which is supportive to his conclusion of the income approach but he gave the most weight to the income approach. His reconciliation analysis gave the most weight to the income potential of the Property, as the motivation for buyers in this market is often to generate income.

Mr. Velez testified that the second level of the Property is in good condition and that it could be rented for approximately $950 per month. He also clarified that while financing may be harder to secure for wooden structures, cash transactions still occur in the market, illustrating a broader market beyond traditional bank financing. He confirmed that obtaining insurance for wooden properties can be more difficult but remains possible. He reiterated that the Property is insurable albeit at a higher cost. He further stated that if an appraiser concludes that a property structure has no value, it must include the costs for demolition.

Mr. Velez explained that in his report, he included the reconciliation analysis below the income analysis, demonstrating the strengths and weaknesses of each approach. When questioned about the impact of income potential on market value, he affirmed that income serves as the foundation for valuing such properties. He concluded that the appraised value of the subject property is $178,500, which reflects a market value consistent with both the "highest and best use" and the methods employed in the appraisal process. He asserted that his appraisal adheres to the Uniform Standards of Professional Appraisal Practice (USPAP).

Mr. Velez acknowledged that the Ponce properties included in his report were structures made of concrete, none of which sold for $197,500 which is the adjusted price for the first

comparable sale in his report. He also acknowledged that wooden second-floor properties are often occupied by family members but stated that he also saw multi-family properties with second-level wooden structured occupied by tenants paying rent. When asked about the comparable sales in his report, he confirmed that he did not find any multi-family properties sold for $197,500 in the Santa Teresita development in Ponce within the last two years, yet he maintained that the Property could reasonably be sold for $178,500.

## IV.     APPLICABLE LAW AND DISCUSSION

In this case, the validity of Blue View's lien is not in dispute. Rather, the issue at hand is the extent of Blue View's secured lien on the Property. The court conducted a valuation hearing under Fed R. Bankr. P. 3012, which implements 11 U.S.C. § 506(a) and "provides that the court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest." 10 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 7001.03[1] (16th ed. 2024).

Under 11 U.S.C. §506(a), "claims may be generally divided into secured and unsecured components, with the secured component being the amount of the claim up to the value of the property at issue, and the remainder of the claim—that is, the amount in excess of the value of the property—being unsecured." TD Bank, N.A. v. Landry, 479 B.R. 1, 3 (D. Mass. 2012). Moreover, a creditor's secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. §506(a) "affords bankruptcy courts flexibility in determining the appropriate valuation method, given the particular facts of the case at hand." Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC), 748 F.3d 393, 406 (1st Cir. 2014).

14

"A court will often be presented with dueling appraisals and must attribute weight to each based on the credibility of the evidence." In re Lewisberry Partners, LLC, 664 B.R. 398, 400 (Bankr. E.D. Pa. 2024). When competing appraisals are submitted, "the court is required to consider portions of each to arrive at what it believes to be a realistic market value for the property." In re Belmont Realty Corp., 113 B.R. 118, 121 (Bankr. D.R.I. 1990).  "A court need not adopt a single appraisal in whole but may form its own opinion as to value considering all the evidence presented." In re Lewisberry, 644 B.R. at 400.

There are three recognized methods for valuing real estate properties: the cost approach, the sales comparison approach, and the income approach. In re Ponce de Leon 1403, Inc., 523 B.R. 349, 397 (Bankr. D. P.R. 2014). "By the cost approach, the appraised value typically reflects the reproduction cost or the replacement cost of the subject property." In re Old Colony, LLC, 476 B.R. 1, 11 (Bankr. D. Mass. 2012) (quoting 150 N. St. Assocs. Ltd. P'ship v. City of Pittsfield (In re 150 N. St. Assocs. Ltd. P'ship), 184 B.R. 1, 6 (Bankr. D. Mass. 1995)). "The sales comparison approach relies on recent comparable sales. Those sales prices are then adjusted by the degree to which those properties differ from the subject property." Id. at 12. Finally, "[b]y the income approach, the net operating income of the property (gross income less the expenses) is divided by a capitalization rate to obtain the fair market value of the property." Id.  "Considered in isolation, these approaches generally do not establish the value of property; rather, value is 'the product of a reconciliation of the indications yielded by the three approaches.'" In re Ponce de Leon 1403, Inc., 523 B.R. at 397 (quoting Henderson v. Cmty. Bank (In re Evans), 492 B.R. 480, 489-490 (Bankr. S.D. Miss. 2013)).

Here, Debtor's appraiser testified that to reach his conclusion of value, he relied on the sales comparison and cost approaches and disregarded the income approach. Per his report

15

"[m]ost weight is given to the value estimate derived by the sales comparison approach, which is well supported by the cost approach." Dkt. 70-1, p.5. The Property's indicated value per his cost approach analysis is $129,237. Dkt. # 70-1, p. 5. And for the sales comparison approach, he used three comparable sale properties. Dkt. # 70-1, p. 4. The first two comparable sale properties were in the same neighborhood as the Property. Debtor's appraiser explained that the Ponce market was unique, which precluded him from considering properties from other nearby municipalities.

Debtor's appraiser made various adjustments to the comparable sales based on the site of the properties, their quality of construction, gross living area, whether the properties have car ports or garages, and other amenities. He gave substantial weight to the quality of construction materials in his adjustments because of the Property's second-floor wooden structure. In fact, he testified that the wooden structure has little to no value. Debtor's report also shows that comparable sale 1 was sold on June 27, 2024, comparable sale 2 was sold on March 27, 2023, and comparable sale 3 on August 28, 2023 but Debtor's appraiser did not adjust their sale prices on account of date of sale. Debtor's appraiser also made no adjustment for any comparable properties with financing concessions made in connection with the sale of these properties. Per the report, he gave most weight to comparable sale 2, which is the most similar to the Property. Dkt. # 70-1, p. 4.

On the other hand, Blue View's appraiser relied on all three approaches, sales comparison, income, and cost approach to arrive at a conclusion of value. He testified that the value of the Property is $178,500 as of November 15, 2024 based on a reconciliation of all three valuation approaches. The Property's indicated value per cost approach is $210,000. Dkt. # 110-1, p. 2. For the sales comparison approach, Blue View's appraiser used five comparable sale properties in his analysis. Dkt. # 110-1, pp. 2-3.

16

The court notes that the first two comparable sale properties in the Blue View's report were the same as the ones used by Debtor. Comparable sale 3 is located in a "competitive neighborhood" to the Property, whereas comparable sale 4 and 5 are located in the municipalities of San German and Guanica, respectively. Blue View's appraiser also made various adjustments to the comparable sales, but his adjustments differ from Debtor's adjustments. Blue View's appraiser adjusted the sale prices of the comparable properties based on type of sale or financing concession (including the $45,000 sale concession for comparable 1 and a $37,500 sale concession for comparable 2 due to its REO status), date of sale, location of the property, and condition of the property. Unlike Debtor's appraiser, Blue View's appraiser gave no importance to the fact that the second-floor structure is made of wood.

In the court's opinion, both expert witnesses were well-qualified and credible. However, the court cannot weigh their appraisals equally due to their divergent value conclusions based on dramatically different valuation analyses. "Valuation is an inexact science and the chance of error always exists. Thus, a conservative approach to valuation has been favored by bankruptcy courts." In re Ponce de Leon 1403, 523 B.R. at 395. "Even though licensed, experienced appraisers are experts, to the extent the expert's opinions have flaws, the Court assigns more or less weight to one opinion than another." In re Kelly, 2013 Bankr. LEXIS 5219, *11-13 (Bankr. D. Mass. Dec. 13, 2013).

First, the court notes that both appraisers acknowledged that the Property's highest and best use is as a multi-family property with two separate and independent units suitable for rent. "A property's highest and best use is the most profitable and likely use for the property." Bay Point Cap. Partners II LP v. Thomas Switch Holding, LLC (In re Virtual Citadel, Inc.), 113 F.4th 1304, 1309 (11 Cir. 2024). However, the testimonies of the experts differ as to the potential

17

rental income that could be obtained from renting the second story of the Property. Appraiser for Debtor, Mr. Flores, stated that even though this type of wooden structure is usually occupied by family members, the same could be rented for $500 to $600 per month.  But admittedly his value conclusion of $125,000 did not consider the income approach and therefore discounted any rental potential.

On the other hand, appraiser for Blue View, Mr. Velez, stated in court that the second story could be rented for $800 to $900 per month. However, the court notes that his appraisal report provides that rent per square foot in that area averages $8.00, which multiplied by 991 which is the square footage of the second floor of the Property, is $7,920 per year or $660 per month. Moreover, Blue View's appraiser disregarded the fact that the second story of the Property is made of wood while acknowledging that financing of wooden structures is harder to secure and that sales of wooden properties are mostly in cash, which is necessarily a more limited market. He also agreed that insurance for wooden properties is substantially more expensive but that also was not taken into consideration when valuing the Property under the income approach.

The court agrees with Blue View that the second level of the Property could potentially be rented to generate income when taking into consideration the high demand and shortage of supply of residential properties in the Ponce area. However, the court agrees with Debtor's appraiser that the wood structure poses certain challenges that are not present with concrete structures that makes it less attractive for renters and for purchasers for income-producing properties. The court also agrees that the unique market conditions in Ponce require that any sales comparison approach be done with residential properties in Ponce.

18

The disparity between the appraisers' value conclusions is not only evident from their testimony but also can be seen in the adjustments made to their comparable sales analyses in their reports. For example, the adjustments made by the two appraisers for the Property used as comparable sale 1 in each of their reports reveal significant differences in how they perceive the Property's features and the real estate market.

| Item | Property | Debtor's Comparable sale 1 (Dkt. # 70-1, p. 4) | Blue View's Comparable sale 1 (Dkt. # 70-1, p. 2) |
|---|---|---|---|
| Address | 5001 San Gerardo St., Santa Teresita Dev. Ponce | 3645 Santa Juanita St., Santa Teresita Dev. Ponce | 3645 Santa Juanita St. Santa Teresita Dev. Ponce |
| Proximity to subject | | .055 miles NE | Same neighborhood |
| Sales price | | $140,000 | $140,000 |
| Sale or financing concessions | | | +$45,000 |
| Date of sale | | June 17, 2024 | June 17, 2024 |
| Site | 254.10 SQMT | 203 SQMTS +$5,100 | |
| Quality of construction | Q-4 mix | q-4/concrete -$14,000 | |
| Age | Debtor: 49 Blue View: 47 | 44 | 44 |
| Condition | Debtor: C-4/Fair Blue View: Average | Average | Average +$12,500 |
| Gross living area | 2246 sq ft | 1740 sq ft +$13,720 | |
| Garage/carport | None | One carport -$8,000 | |
| Amenities | | -$3,000 | |
| Net adjustment | | -$6,180 | $57,500 |
| Adjusted sales price | | **$133,820** | **$197,500** |

Debtor's appraisal shows a net adjustment of -$6,180, resulting in an adjusted sales price for comparable sale 1 of $133,820. The adjustments include a $5,100 adjustment for site size, a $14,000 deduction for quality of construction (rated Q-4 mix construction; wood and concrete), a

$13,720 adjustment for gross living area, a $8,000 deduction for a lack of a carport in the Property, and another $3,000 deduction for other amenities. In contrast, Blue View's appraisal reflects a much larger net adjustment of $57,500, leading to an adjusted sales price of $197,500. Blue View adds a substantial $45,000 adjustment for the financing concession given to purchase homes after Hurricane Maria and a $12,500 adjustment due to the inferior condition of the comparable property, concluding with a markedly higher valuation. While Debtor's appraiser gives emphasis to the mixed construction of wood and concrete (Q-4 mix) of the Property, Blue View's appraiser, not only disregards that the second floor of the Property is made of wood and made no adjustments on account to that, he considers that the Property is in such good condition that he adjusted upwards the price of the comparable sale 1 due to an inferior condition. These discrepancies highlight the differing approaches to adjustments for property characteristics by the two appraisers, with Blue View's adjustments resulting in a substantially higher adjusted price than Debtor's appraisal for a property sold in the same neighborhood as the Property for $140,000 on June 17, 2024.

Similarly, the adjustments made by the two appraisers in their reports for comparable sale 2 highlight divergent valuation strategies.

| Item | Property | Debtor's Comparable sale 2 (Dkt. # 70-1, p. 4) | Blue View's Comparable sale 2 (Dkt. # 70-1, p. 2) |
|---|---|---|---|
| Address | 5001 San Gerardo St, Santa Teresita Dev. Ponce | 5023 San Pedro St., Santa Teresita Dev., Ponce | 5023 San Pedro St. Santa Teresita Dev. Ponce |
| Proximity to subject | | Less than 0.01 miles | Competitive neighborhood |
| Sales price | | $125,000 | $125,000 |
| Sale or financing concessions | | | +$37,500 |
| Date of sale | | March 27, 2023 | March 27, 2023 +$12,500 |

20

| Site | 254.10 SQMT | 213 SQMTS +$4,100 | |
|---|---|---|---|
| Quality of construction | Q-4 mix | Q-4/concrete -$12,500 | |
| Age | Debtor: 49 Blue View: 47 | 46 | 46 |
| Condition | Debtor: C-4/Fair Blue View: Average | Average | Average $12,500 |
| Gross living area | 2246 sq ft | 1,876 sq ft +$11,000 | |
| Garage/carport | None | | |
| Amenities | | -$3,000 | |
| Net adjustment | | -$400 | $62,500 |
| Adjusted sales price | | **$124,600** | **$187,500** |

In Debtor's appraisal, the adjustments resulted in a modest net effect of -$400, leading to an adjusted sales price of $124,600. This appraisal included a $4,100 increase for site size, a $12,500 decrease for quality of construction (rated Q-4), and a $11,000 increase for gross living area, with a minimal deduction of $3,000 for amenities. Conversely, Blue View's appraisal presented a much larger net adjustment of $62,500, resulting in an adjusted sales price of $187,500. Blue View applied a significant $37,500 adjustment for sale or financing concessions given the property's REO status at the time of sale and included a $12,500 adjustment due to market conditions given the date of sale in March 2023. For comparable sale 2, the appraisers again substantially diverge as to the Property's construction quality and condition. The considerable difference in the total adjustments indicates that Blue View's approach reflects a more aggressive valuation resulting in adjusted price of $187,500 for a property sold for $125,000 on March 27, 2023, while Debtor's appraisal applies a more conservative and restrained perspective on the value of properties which the court favors pursuant to caselaw.

21

The disparity between the appraisers' opinions is also evident in their cost approach analyses, which they both admittedly used to reach a market value conclusion.

| | Debtor's Appraisal (Dkt. # 70-1, p. 5) | Blue View's Appraisal (Dkt. # 110-1, pp. 2-3) |
|---|---|---|
| **Opinion of site value** | $26,600 | $25,400 |
| **Dwelling** | 2,426 sq. ft @ $50.00 = $121,300 | 1,435 sq. ft. @ $110= $157,580 991 sq. ft. @ $60= $59,460 Additional features: $25,000 |
| **Porch** | $5,550 | |
| **Total estimate of Cost-New** | $126,850 | $242,310 |
| **Less** | | |
| **Physical Depreciation** | ($31,713) | ($60,588) |
| **Depreciated Costs of Improvements** | $95,137 | $181,732 |
| **"As is" value of site improvements** | $2,000 | $2,868 |
| **Wooden terrace & wooden balcony "as is"** | $5,500 | |
| **Indicated value by cost approach** | **$129,237** | **$210,000** |

Debtor's appraisal estimates the total cost-new at $126,850, with a dwelling size of 2,426 sq. ft. valued at $50 per square foot, leading to a depreciation of $31,713 and an indicated value of $129,237. In contrast, Blue View's appraisal, values the dwelling in two portions but at higher rates of $110 and $60 per square foot, resulting in a much higher total cost-new of $242,310. Blue View also accounts for additional improvements and features differently, such as not assigning a cost to the wooden terrace and balcony but applying a higher physical depreciation of $60,588. Ultimately, Blue View arrives at a substantially higher indicated replacement cost value of $210,000 compared to Debtor's figure of $129,237.

In summary, the two experts provided significantly different valuations for the Property, estimating it at $125,000 and $178,500. Debtor did not take into account the Property's potential to generate rental income from the second level, especially given the current high demand and low supply of residential properties in the Ponce area. Meanwhile, Blue View overlooked the fact that the second story of the Property is constructed of wood rather than concrete, and the adjustments made in their report were excessively generous. As a result, the court cannot fully credit one appraisal report while dismissing the other. This court favors the more conservative value presented. Additionally, the substantial disparity in the cost approach between both appraisers reinforces the conclusion that neither report is entirely reliable.

This court agrees that Ponce is a unique market and is reluctant to rely on the comparable sales of similar properties in the municipalities of San German and Guanica which this court takes judicial notice are substantially smaller in size than Ponce. Debtor's appraiser estimated 10% deduction because of the mix construction of wood and concrete which this court finds reasonable considering the various complications addressed earlier related to construction in wood. In addition, the adjustments made by Blue View's appraiser in the financing concessions line are unsubstantially high although the court agrees a lower adjustment could be established as reasonable. Blue View's appraiser is also very generous in the condition line adjusting upward both comparable sale properties without explanation when the condition is provided as average for both the Property and for the comparable properties. In fact, as to the condition, Debtor's appraisal report provides that it requires broken windows replacement and removal of bat infestation in the second-floor unit.

Therefore, modifying the adjustments made in Blue View's appraisal report—reducing 10% in the value of the comparable properties because of the mixed construction, dividing by

half the financing concessions and eliminating the upward adjustment for the condition—the value of comparable sale one would be $148,500 and comparable sale 2 $143,500, the average of those would be $146,000, a notable decrease from what is currently $192,500. Blue View's sales comparison approach values the Property at $180,000, which is somewhat puzzling, considering this figure is higher than the income approach value of $178,500. The court is also unclear on how Blue View's appraiser arrived at the value of $180,000, as the average of the five comparable properties included in the report exceeds that amount.

In his testimony, Blue View's appraiser stated that in determining the value of the Property he gave the most weight to the income approach. As stated, Blue View's report provides that the average rent per square foot in that area is $8.00 annually. To calculate the value of the Property, Blue View's appraiser, used the effective gross income multiplier ("EGIM") method as explained in the report. Using comparable yearly rents in the same neighborhood and similar ones, he concluded that the EGIM is 9.2 and he multiplied the yearly effective gross income by that amount to arrive at $178,554 which he rounded to $178,500.

However, Blue View's appraiser utilized comparable rents from concrete structures and did not account for the fact that the area to be rented in the Property is constructed of wood. More importantly, he focused on effective gross income rather than net operating income, failing to consider the associated expenses of renting the space, including insurance, which, as acknowledged, would be more costly. Moreover, to arrive at the yearly effective gross income of the Property he multiplied $8.00 times 2,426 which is the square footage of the entire Property. Based on the testimony presented, the court finds that the highest and best use of the Property— and its likely use—is the rental of the second level while the first level is used as the residence of the owner. The income producing part of the Property is 991 square feet which is only the second

24

level, therefore the correct number to multiply by the 9.2 EGIM is $7,928 ($8 times 991) to arrive at $72,937.60. Consequently, the court is not satisfied that Blue View's appraiser adequately and appropriately calculated the Property's value using the income approach.

The court will assign more weight to Debtor's appraisal as the more conservative compared to Blue View's, while acknowledging that Debtor's report does not contemplate that the Property could generate income. The court considers Blue View's valuation of $178,500 overly aggressive and based on inaccurate numbers for the reasons detailed above. Therefore, in recognition that "[v]aluation is an inexact science" (In re Ponce de Leon 1403, 523 B.R. at 395), the court concludes that based on the testimony and the documentary evidence presented at the valuation hearing, the Property has a value of $135,000.

**CONCLUSION**

In view of the foregoing reasons, the court finds that the value of the Property for confirmation purposes is $135,000. Debtor is granted thirty (30) days from the entry of this order to file a new SubChapter V plan with the court consistent with this order.

**IT IS SO ORDERED.**

In Ponce, Puerto Rico, this 14th day of April 2025.

María de los Ángeles González
United States Bankruptcy Judge

25